The court will proceed to the fourth case, United States v. Hunter and Evans. Mr. Richards Mr. Richards I please the court. Good morning. I think Attorney Mark Richards representing Deshaun Evans, one of the two appellants. I think when one looks at the record in this case the sides can probably agree on one thing, and that was that there were two voir dires for one jury trial. And in this case there were, starting with 30 panel members, of which two were African Americans, Ms. Edwards and Ms. Duggar. And in the selection there was one African American who never got on the panel who was in the panel of 50. But in the selection, Judge Todd Miller went through the general questions. He asked a question about if anybody found their way into a courtroom or something in that vein. And many of the jurors, white and black or African American, did not come forward. The jury selection went on, and there was a sidebar right before the strikes. And the sidebar is a matter of contention between both sides, and that is in regards to Ms. Duggar. She had stated that she had a plane or a vacation on Wednesday, not speaking as to whether or not it was Wednesday this week, Wednesday next week, or some Wednesday in the fore. Did Judge Stratton Miller have the sidebars recorded? No. And we went up to the sidebar right before the strikes, and several of the individuals regarding for cause were discussed. Judge Todd Miller and Ms. Tableson both thought she should be struck. I was there. I objected. I wanted her questioned individually in chambers. Both parties, the judge and counsel for the government, looked at me like I was from Mars, and we went back into chambers. And if you look in the appendix, the questioning as it goes through Ms. Duggar, the judge asked several questions about who's going, the unfundability and things like that. The government asks no questions of Ms. Duggar. I begin questioning, and I ask specifically questions, general, and then I go into when was the date, Ms. Duggar. And she says, not this Wednesday, the following Wednesday. And at that point, I believe it's Ms. Honrath, but Ms. Honrath starts asking her questions, which had not been asked and obviously had nothing to do with the date. Now it was about her employment, being familiar with Mount Sinai, her feelings on carjackings and things like that, things that had never been asked before. And then we come to Ms. Edwards. Well, let me back up a second. Ms. Duggar is dealt with. She said she can be fair. The scheduling issue has been taken care of, and she's excused. We get to Ms. Edwards. And she's excused or she was seated? She was seated. She was excused from the room. I'm sorry about the terminology. And we go to Ms. Edwards, and the questioning regarding Ms. Edwards is general, vague questions, nothing about the specifics of this Facebook post, and does not really confront the issues. And there's a motion by the government to strike Ms. Edwards for cause, for the first time. The judge denies that motion, and we go forward. Then we're getting ready to do the strikes, and Judge Stidemiller was very clear to the government and says, if you strike her, we're going to a full-blown Batson hearing. They hadn't made the cause. It was clear. And then we go out, we do the strikes, the last strike of the government. He knew that you were indicating you'd bring a Batson challenge. I didn't even have to. They moved to strike. We objected, myself and Mr. Harris. And the judge said, if you strike her, we're going to have a full-blown Batson. So it was inferred from the record. I think it was pretty clear. And we go out, we do our strikes. The government's sixth strike is Ms. Edwards. And I asked to be heard regarding a Batson challenge. The judge does have the Batson hearing. We break for lunch, do additional investigation of what was going on, and we then go into questioning, argument, things like that. And when I made my record, I specifically said that the government had moved to strike Ms. Duggars also, an African-American. Later on, the government disagrees with that. But I think when you read Judge Stadmiller's remarks in the appendix, I believe it's 124, it talks specifically what he says. On the surface yesterday, reading appendix 124, line 19, on the surface yesterday when we held the sidebar conference, there were concerns both about Ms. Edwards as well as juror 12, Ms. Duggar. Ms. Duggar, because of non-refundable airline tickets, which upon further questioning disclosed that although for a Wednesday flight, it is not this Wednesday, but next week. And then it talks about Ms. Edwards. We then go into the second round of questioning, and Ms. Edwards talks and is asked about a Facebook page. She is not confronted with the contents of that Facebook page, and the government moves to strike her again. And I asked the court, and I told the court, I said, if they've got something on her that they want to confront her with, they need to confront her, not just that she's saying something about a Facebook page. We bring Ms. Edwards in for the third questioning, and at the third questioning, Ms. Edwards is asked about her Facebook page, and it's inferred from United States Attorney Tableson that this is a website that is anti-white, and Ms. Edwards is very clear it is not. It's a religious website, and it has to do how blacks were treated in slavery. She's asked about her family. She's asked about her bankruptcies. She's asked about going to court on evictions, collection matters, and she says, I went for my bankruptcy. I was there for my kids' prosecution in juvenile court approximately 14 years ago. And that is that. And they then, we go to the second strikes later on, after trying to get her excused for cause failed, and they strike her. They say that they've struck everybody who was similarly situated. Well, Mr. Costorza, who ended up being the foreperson, had the same things, bankruptcies, foreclosures, all of that. They never came up with the original reason. They went on, and through a second Batson, they tried to come up with the post hoc justifications. But I submit to your honors that the second Batson hearing wasn't even needed. He was told not to strike. There was no race neutral reason. And then we go on to the second one. And I still to this day don't know why we did that. They should have put him back on. Her, excuse me. All right. Well, I'm going to give you some time for rebuttal because you used it all, Mr. Richards. I apologize. Thank you. Mr. Nash. Thank you, Judge. May it please the court. My name is Michael Nash. I represent Otis Hunter. Otis Hunter is a 24-year-old young man who was sentenced to 107 years in prison. The other defendant was sentenced to 37 years. He was 18 or 17 years old at the time. The first thing I'd like to say is that we, in our brief, in the argument regarding the cross-examination of the witnesses, the cooperators, we faced a Trent case authored by Judge Kaney. But this case is different in the sense that in Trent, the defendants did not bring up the fact of the presumption that jurors follow instructions. And if any fact could make it more different, I can't imagine what it is. But we, as lawyers who have practiced in this building and other courtrooms, know that that's a principle that we rely on. It's absolutely necessary. And the government argues here that the prejudice to them of us being able to bring out before the jury the tremendous penalties these fellows, cooperators, faced would be prejudicial. But they then say that being able to say, well, it's a substantial jail term, that's just the equivalent and the jury wouldn't have heard anything really different. Well, those are two inconsistent arguments. They can't mesh with the fact that we know that juries do follow instructions the vast, vast majority of the time. The other thing I would say... Can I ask you, I don't want to take you away from the Trent argument, but I'd like to get your reaction or Mr. Richard's reaction when he stands back up to an impression I had from reading the voir dire. So can I run that question by you? Or would you prefer that I hold that for your colleague? My colleague is much more... Okay, I'll do that. I really concentrated on this issue. No problem. One thing I wanted to say is that when I read the facts in this case, I was surprised because at least in the Northern District of Illinois, this has not happened. I'm trying a case right now before Judge Kendall, where all the cooperators faced either death or life imprisonment. We were able to cross-examine them fully about it. No prejudice to the government. Government didn't make any motion to eliminate. And the problem with a case like this is it gets settled and then other prosecutors say, well, we can limit the cross-examination in this way. Substantial. What is substantial? We've listed a number of cases in our brief about what substantial is. I recall Oscar Wilde comment that he could resist anything but temptation. Well, temptations are different. They aren't all created equal. And in this case, not being able to tell the jury the motive, the real motive these cooperators had to lie and the bias that they did is essential. And this isn't harmless error either because the case rides or falls on the cooperator's testimony. Not being able to discredit them and show the full motive and bias that they had to lie and deceive and cooperate with the government to get out from under these mandatory sentences that they faced was absolutely crucial, if the court has no questions. The only thing I would say is that you do have the Ninth Circuit on your side. Well, we do, but I know that that isn't always an ad. An advantage sometimes. Thank you. Thank you, Mr. Nash. Mr. Kruger. May it please the court. I'm Matthew Kruger, the United States Attorney. The government here exercised its peremptory strikes for race-neutral reasons that it applied equally across jurors, both white and African American. The government used five of its six peremptory strikes on white jurors. As to Juror 12, Ms. Dugger, for which there was a lot of discussion, with all due respect to defense counsel, they are misrepresenting the record as to Juror 12. The government at no point moved to strike Juror 12, another African American, who did, in fact, serve on the jury. Juror 12 had said in voir dire among all of the jurors that she had nonrefundable travel plans. There was a sidebar at which the jurors who would be individually questioned were determined. Juror 12 was called at that point because she had raised these travel plans, not because there would have been a motion to strike at that early phase of a sidebar when the parties were just deciding whom to question more. When Juror 12 then appeared, it was defense counsel and the trial court who asked Juror 12 about her travel plans. It quickly became apparent that her plans were not to leave until the following week, at which point there was clearly not a basis for a motion to strike, and the government never made one. If there had been a motion to strike, you would have seen it in the record after the discussion. And so that is just false, and it's pertinent because How do you make your motions to strike of the record? I mean, at the sidebar or at what point? The motions to strike were made on the record, and that's apparent if you look through the transcript. Well, I understand that, but as you said, is it made at the time, at the sidebar with that particular juror, discussing that particular juror, or is it at another time where you list your strikes? I see. If you read through the transcript, you'll see that the strikes to move particular jurors tended to happen after questioning the individual juror. And so, for example, Juror 35, who was not disclosed by the clerk's office to the parties, after further voir dire of him, then you saw a motion to strike on the record. But, again, there is no motion to strike, Juror 12, and that's pertinent because it shows that the government was not engaging in a racially motivated manner of trying to remove jurors. Mr. Krieger, let me get you to react to what I think would be helpful to Mr. Richards to react to as well, and it's this. When I look at the transcript, what makes good sense to me is allowing the additional question of Mr. Haberstadt, Number 35. And the reason is because the district court seemed to think there was enough confusion about whether this particular fellow was on an initial list, et cetera, et cetera. I'm going to allow questioning of 35. That makes sense to me. They may not have liked that, but that makes sense to me. What I have a harder time with, though, is reopening questions on Jurors 5 and 36. In other words, the Batson issue was on the table, and the government, when this issue with Number 35, Mr. Haberstadt, came up, I think he was in the bathroom or something? He was delayed. They couldn't find him. At that point, the government says, Look, we'd like to ask some questions of Number 5 again. That's on page 90 of the appendix, and then it later comes up, the same pattern comes up with Number 36. What I'd like you to speak to is, does that reflect legal error as a Batson procedural matter? Now, the defendants, to be sure, never objected at the moment to the additional questions of Jurors 5 and 36. Mr. Richards, in fairness, made an elaborate objection later. But can you address the Batson procedure of reopening the questioning? Yes, thank you, Your Honor. It was not legal error because there isn't a particular prescribed rule in the case law in Batson itself or this court's decisions that would prevent that. Instead, Batson sets forth its three-step framework, but otherwise expressly declines to prescribe particular procedures. I'd cite to you also Morgan v. City of Chicago, in which this court rather recently also observed that there's a lot of discretion left to district courts to handle jury selection and how to ferret out the truth of prosecutors' explanations. The district court here was trying to be fair to the parties to allow them to make the records they wanted to make. Because the defense had raised Jurors 5 and 36, the government expressed, sort of posed the question whether there was a need to question those jurors more. And as to the first one, it was the district court himself who suggested that would be appropriate. And what you see the court doing is trying to allow an open process to get the facts on the table so that it can make the credibility determination. And that's what this ultimately is about. It's a credibility determination as to the veracity of the prosecutors' explanations. The reason why proceedings went to the second day is because of the odd circumstance that Juror 35 hadn't been disclosed before. And that just goes to show that trials happen in the real world with real people. Unexpected things happen. And so that's why district courts are given that discretion to be able to fashion voir dire and the procedures in a way that makes sense. It's not clear that the additional questioning of 5 or 36 would have necessarily benefited the government. And so it wouldn't be a reason to say that there's legal error here. Ultimately, the district court examined the government's reasons for striking Juror 7. They remained consistent throughout. From the beginning of a Batson challenge, the government explained that it was striking Juror 7 because of the criminal involvement that her son and her ex-husband had had as well as her lack of candor about civil cases when directly asked about them. And then the government, as information was brought to light, applied those same reasons in an even-handed manner, striking white Jurors 3, 22, 35, all of whom had criminal convictions themselves, and then 36 who had a close family member. And so this is an even-handed, race-neutral approach to white and black jurors alike while allowing another African-American juror, Number 12, to sit on the jury without trying to remove her. The defense also puts a lot of emphasis on what it characterizes as the warning from Judge Stadmiller, and with all respect, that's also not an accurate characterization of what happened. If you look at page 50 of the appendix, because the defense counsel, as Judge Keeney noted, had previously foreshadowed a Batson objection to strike Juror 7, it was in the context of that that Judge Stadmiller was letting the parties know that if Juror 7 was struck, and that if defense followed through with a Batson objection, that the court would take its time and carefully look at this, which would then affect the start of trial. And so that allowed the government to reschedule witnesses for the next day, and the court then engaged in what was really a good-faith effort to deal with a quirky situation of Juror 35, somebody who it turned out had a very serious criminal history, had been very recently found mentally deficient, who otherwise would have been seated on the jury panel. And so there was good reason for the court to find a way to both assess the prosecutor's credibility, but also to determine how to handle this funky jury situation. The defense counsel also put emphasis on the Facebook profile of Juror 7, and with all respect, that is not a reason to find a problem in this case. The Facebook post on its very title was, in fact, there were reasons for concern, saying that white historians had lied about history. And just a simple look at that same organization's page now, Israel United in Christ, shows that there are other postings there that similarly have racially-tinged posts. And so it was a very appropriate thing for the government to inquire about that, because there would have been witnesses at this case of a multiple of races. Ultimately, the Batson issue again comes down to a credibility determination. There is no legal error here. The defense has not cited any authority to show that there was a legal error. And because the district court was able to observe the demeanor of the prosecutor and the jurors, there isn't reason on this cold record for this court to set that credibility determination aside. I'll now turn attention to the Trent issue. Trent was decided just two years ago without any dissent. It was correctly decided, and it's consistent with Supreme Court precedent. The Supreme Court made clear in Van Arsdale that although defendants are allowed an opportunity to make effective cross-examination, district courts are also still allowed wide latitude to place limitations on cross-examination, particularly when the cross-examination could elicit information that would be irrelevant or potentially confusing, as the Supreme Court in Shannon showed that this sort of testimony would be. The defense suggests that there were multiple cooperating witnesses for whom their cross was severely limited, and that's just not accurate. There was only one cooperating witness who had a mandatory 25-year 924C sentence dismissed. That was Kelly Scott. The cross-examination on Kelly Scott was vigorous, and it went even beyond the lines that Trent laid out. The defense was able to elicit not only that Kelly Scott would have allowed a substantial time that was going to be consecutive to another mandatory minimum, but also that at age 29, Kelly Scott would not see the, quote, light of day. And so that gave the jury a very good sense of the fact that Kelly Scott was avoiding substantial time, lengthy time, and the point is it allowed the jury to make an accurate assessment of his potential bias against the government. And that's the core of the Confrontation Clause right, that the jury not be left with a misimpression about the witness's potential for bias. With all respect, I don't think that there's a conflict with the Ninth Circuit. The case in Larson does not set forth a categorical rule that you may always elicit. That was an en banc decision, right? That's true, Your Honor. But even I would say the facts of it are distinguished. Larson didn't set a categorical rule that you may always elicit the mandatory minimum penalty. Rather, that case turned on the particulars. In Larson, there was a mandatory life sentence that was being avoided, and there wasn't any cross allowed about even the existence of a mandatory minimum penalty. Whereas here, again, Kelly Scott, they brought out that there was a mandatory minimum penalty, that it was going to be consecutive, and would have meant that he never saw the light of day. On top of that, even if the court were to have any concerns, it's certainly not that the difference between that cross that was allowed and the cross that would have brought out the mandatory 25 years would not have affected the trial here. From beginning to end, the defense counsel vigorously crossed on the potential bias of the cooperators, and the evidence was overwhelming. I want to touch just briefly on the pro se issues raised in Hunter's brief, in case there are questions on those. He is concerned about the testimony of three witnesses, but none of the testimony of those witnesses, Doris Brown, Kelly Scott, or Dominique Rollins, were admitted in error, certainly not in reversible error. He also complains about the testimony of Investigator Strasser, who was permitted to just give a minute or two of testimony showing similarities between the robberies. There was no objection to that, so your review would be for plain error. Again, I submit no error whatsoever, but certainly not something that would have affected the trial, given that the reason the testimony was kept out was that it would have been cumulative of the other substantial amounts of evidence that inculcated the defendants. As to the sufficiency of evidence challenges, there was a stipulation as to the interstate commerce of George Webb's restaurant and the Romans food market, and the evidence certainly gave a rational juror reason to think that the commerce there had been interrupted, and you only need a de minimis interruption for there to be an interstate commerce nexus. And as to the mens rea for the carjackings, certainly there was evidence here to find that there was at least a conditional intent to cause death or serious bodily injury, because as to Mr. Shea, he was forced down to the ground and hit on the head with a gun, and as to Mr. Sherman, a gun was pressed against his stomach as he was told to remove his possessions, including car keys, in a commanding tone. This fits well within what a rational juror could find to show the requisite intent. I want to make a comment just briefly that these were filed by Mr. Hunter Proce, I think. I am concerned that we do allow that when he's already represented by counsel, but we'll certainly consider those arguments because we allowed it to be done. Thank you, Your Honor. In my limited experience, I haven't seen that either. It does seem a bit unusual. At bottom, the defendants had competent counsel who vigorously tried this case and aggressively challenged the government at every turn, crossing the witnesses aggressively, but there was substantial evidence, and the jury found beyond a reasonable doubt that they were guilty. Based on surveillance video, identifications, physical evidence that corroborated these robberies, they were serious crimes. They are a long sentence, but with all respect, they were warranted. And so with respect, the government asks that you affirm the judgment and the convictions in this case. Thank you. Thank you, Mr. Kruger. Mr. Richards, you may have two minutes. Sir, Your Honor, you had a question regarding Mr. Haberstadt? Yeah, the question that I put to Mr. Krieger regarding the... Just in reading the transcript, I totally understand why Haberstadt was questioned. I mean, I know you may not have liked that or preferred that, but he was questioned. But what I was wondering about is why was additional questioning allowed on 5 and 36? I have no idea. And... Can I offer a hypothesis? I mean, I wasn't there, okay? But it seemed to me that in the wake of the confusion over the list, okay, and who's on the list and who's not and who's asking questions and what, that Judge Stadtmuller, just in the exercise of his discretion, said, all right, look, if we need to ask 35 Haberstadt some additional questions, I will allow, at the government's request, additional questioning of 5 and 36. It doesn't seem to be anything more to it than that. And that may be. But Haberstadt was objected to or brought up in the terms of the reasons for strikes on Edwards. And it was very... They said, oh, we didn't know about it. Well, we didn't get our list till Monday, whether that's our fault for not picking it up on Thursday or whatever, but he was on the Monday list. And we were able to, once this Batson matter came up, go out, get on our computers, and check these things out. And that's where we found out the Waukesha convictions. Is it the questioning, though, on 5 and 36, at the end of the day, bottom line for you, that that's what reflects the legal error that warrants a new trial? And opening up Ms. Edwards' questioning on three different occasions. You know, they moved a strike, and they haven't confronted her with the Facebook. Judge Stodmiller says, you have to confront her. And so then they start asking the questions, and the record is... I got it, I understand. The record is full of people who at court didn't understand his questions, bankruptcy, civil things, all those things. And that's where the problem in this case lies. There should have been one Batson hearing, there should have been one jury, and if that doesn't work, then you pick a whole new panel and you start over. You don't leave the same 30 people and say, let's do it again to give them reasons for the strike. Thank you very much. Thanks, Richard. Mr. Nash, you may have three minutes, Mr. Nash. First of all, I'm always intrigued when I hear the prosecutor say that the evidence was overwhelming. I remember being at my parents' house. I was in the U.S. Attorney's Office. I tried my first case, and my mother said, how'd the case go? And I said, it's a lock. My father said, we've spent 25 years as an assistant state's attorney, said, spoken like a true prosecutor. But the fact is, the evidence is overwhelming if we can't cross-examine the witnesses and show the jury the motive for them to lie and to get out from under these sentences. And really what we're talking about, although many of these cases use the word confusion and confusing, the fact is, what the government's concerned about is that the jury will learn the horrendous nature of their sentence, transform it to the defendant's, and find the defendant's not guilty. But that goes against every precept we have, that the juries follow the instruction. And prosecutors said they got an accurate account of what these fellows faced. No, they didn't. They didn't get the facts of what they faced. That's the accurate account, and that's what we should have been able to do. And the problem with a case like this is that the government uses it to curtail the cross-examination in just a situation like this. That's not done in the Northern District of Illinois. It's not done in the Northern District of Indiana, because I just wrote another brief where they were allowed to do exactly that. And there was no reason to do it here. Thank you. Thank you, Mr. Nash. Mr. Nash and Mr. Richards, first of all, thanks to all counsel, but of course you have the additional thanks, both of you, for accepting the appointments in this case. You're welcome.